WALDEN In this off-table Vaccine Act case, the Special Master reviewed all of the evidence, drew plausible inferences from it, and articulated rational reasons for finding that Petitioner failed to meet his burden of proving actual causation by a preponderance of the evidence. The Special Master's decision was therefore not arbitrary and capricious. And because it was not arbitrary and capricious, the Court of Federal Claims was compelled to uphold it, as this Court has held numerous times. But the Claims Court never even asked whether the Special Master's findings were arbitrary and capricious. Instead, it did precisely what this Court said and what Congress has said it shouldn't do, namely re-examine all of the factual evidence and re-weigh it as if it were the de novo fact-finder in the first instance. Well, are there circumstances, there are circumstances in our cases where the Court of Claims is allowed to do that or has done that, right? Why is this different from those circumstances? Because the Court of Federal Claims must first find that the Special Master's findings were arbitrary before it may substitute its own findings. It never engaged in that inquiry in this case. And we do think that if you did look at the Court of Federal Claims' opinion, we think it fails for many of the same reasons that the Special Master's decision wasn't arbitrary, so they dovetail in this case. But the first question that should be asked in every such case is, was the Special Master arbitrary? Meaning, did he or she look at all of the relevant record evidence, were plausible inferences drawn from it, and rational reasons articulated? And in this case, I think on the face of the Special Master's decision, that's exactly what happened and therefore the decision is not arbitrary. And what were the Special Master's findings in particular on the issue of causation? There were two main pillars of the Special Master's argument. The first was that according to the relevant record evidence and the expert witness testimony, the child developed normally for the seven months following the vaccine, which the Special Master found, quote, strongly suggested that the vaccine did not cause the injury. In other words, there was no logical sequence of cause and effect. And second, the Special Master found that the two principal experts that Petitioner offered, Dr. Shane and Dr. Megson, were not persuasive or credible experts, especially as compared to the experts that the government offered. And those are the two main reasons, and we can go through, starting back with number one, the... Because there was evidence in the record of early developmental delay, but I guess what you're saying is that you don't need to prevail on both of these. You only need to prevail on one of them. I think that's true, but I would also add, Your Honor, that close questions are precisely the ones where you afford deference. Well, I mean close questions as to whether it was entitled to deference. Whether it was entitled to... Well, are you saying whether it was arbitrary finding... A close question as to whether it was arbitrary. Whether it was arbitrary. I think you can find it on either one. I think that's true. And then there's also a second portion of the Special Master's decision, which was the Alvin Pong three, about the timing, and there the Special Master said, number one, that the case law requires the Petitioner to establish the timeframe in which medical science would expect the injury to be manifested. And the Special Master said the Petitioner failed to present any evidence on that part at all. And that was a part that the claims court never even addressed in its opinion. We do have cases, do we not, from the Special Master and the Court of Federal Claims finding that this vaccine can cause the kind of brain injury that's involved here. Am I correct about that? I think that there are cases that accept. I think that goes to the medical theory of prong one, rather than to the timing of prong three. But I think in any event, I think you can rely entirely on prong two, which was the one that was the principal portion of the Special Master's decision. Well, I guess what I'm wondering about on the second argument that you're making about the expert testimony, is it really necessary to have expert testimony on the causation or can a Special Master draw conclusions about causation from other factors? For example, the fact that in other cases, this has been found to be causative, the fact that the second vaccine was not administered, the fact that there was some problem after the vaccine was administered, I mean, there are a variety of things here apart from the expert testimony that could be viewed as bearing on causation. Is it the government's position that you have to have expert testimony, a credible expert testimony on causation? Well, I think that certainly credible expert testimony on causation would assist a petitioner's case. I don't know. I suppose you could imagine, I can't really determine. I think you'd have to look at a particular case and see what evidence meets the preponderance and what doesn't. I would hesitate to say, give a uniform rule as to what type of evidence you have to offer in every case. But I will say this, here we have the medical expert, which was found not persuasive by the Special Master. I don't think that what you could do is simply point to other people who have established their case with the same vaccine. Remember, this is an off-table case, you have to prove actual causation, and it's not normally the case that in a tort suit or under the Vaccine Act, that you would just be able to say other people prevailed, therefore I should prevail. Well, I'm not suggesting that that in itself would be sufficient. I'm just suggesting that that might be a factor which would support in part a finding of causation and that there are other factors here which might have been relied on to lead to a finding of causation. I mean, if for example, the Special Master were to say in one of these cases, well, I can't find causation because there's no credible expert testimony supporting a finding of causation. Now, would that be reversible error for the Special Master to rely on the absence of expert testimony as itself determinative of the plaintiff's case? In other words, that you must reject the plaintiff's, the claimant's case because there is no expert testimony. I think that's a much closer question. Of course, that's not what we have in this case. And I think you would, I hesitate to answer it because I think it would depend on the totality of the evidence. And I think that a Special Master should take in all the evidence and not just simply look at experts. If they offered experts and that's all they offered, and they were found not credible, I think you would lose your case because the only evidence you had was found not persuasive. If you had other evidence, perhaps finding your experts not credible, the other evidence might be sufficient in a particular case. In this case, however, it's not only that the Special Master found that Drs. Megs and Shane were not persuasive, but that the government's witnesses, Dr. Witzeser in particular, was not credible in saying that there was not developmental delay. And in fact, Dr. Turow, the treating physician, said that he did not think that there were missed milestones showing developmental delay. Well, your expert didn't address the causation question, if I recall correctly, is that right? Our witness addresses whether there was developmental delay during the... But not the overall question of causation. I think that's right. It was the Special Master who concluded that because there was no developmental delay during those seven months, that strongly suggested no causation. And in this case, we have three examinations by the treating pediatrician in the seven months after the vaccine was administered. And in each of those, the treating physician noted it was a well baby with normal neurological development in each of the three instances. And we have Dr. Witzeser saying there was no developmental delay during this time. We have Dr. Turow, the treating physician, saying, I don't see missed milestones here. I see normal development. And he specifically said, I do not see, even at nine months, two standard deviations off the mean, which petitioner's brief said is the test for whether there's developmental delay. So Dr. Turow, Dr. Witzeser, all supported the Special Master's decision that there was a finding that there was no developmental delay during this period. I think that's an ample and sound basis for the Special Master's factual finding. It was based in the record. It was a plausible inference. And he even conceded. He said, you know, this isn't a one-sided case. That seems to be mixing up the two things that you separated earlier. One is the developmental delay issue, which to me is a closer issue than the second one about the lack of credible expert testimony. And I guess I'm wondering, to what extent does the Special Master's decision rely solely on the lack of credible expert testimony, putting to one side the developmental delay issue? Well, I think in looking in the context of this particular case, if petitioner has basically puts forth expert testimony and then there's the record evidence, these well-baby visits, the well-baby visits certainly don't say anything on their face that shows developmental delay. And if the experts don't add anything to that, there's simply an absence of evidence. So if you agree that the experts were not credible or persuasive, there's really not much left in the case beyond that. That's what I'm not sure about, because you've got this fact that in these other cases there was a relationship that was found. You have the fact that, you know, there's no other cause that's been identified for this, you know, that there was an adverse reaction to the vaccine, you know, I mean there is other evidence other than the testimony of the experts. Well, certainly the Special Master didn't deny that there was other evidence on petitioner's side. It never said this was a case in which all the evidence was on one side. But what it did is it found the government's case more persuasive, or at least the petitioner hadn't met the burden of proving by a preponderance of the evidence actual causation. And in a case where there is competing evidence on both sides, it's precisely the province of the Special Master to make those determinations. Now if the Special Master had ruled against us, we would face an uphill battle on appeal also to try to overcome that. But the same is true on the other side for the petitioner, who must overcome that high arbitrary and capricious review. And I think if you think that the evidence is sort of mixed, and there's evidence on both sides, it's really up to the Special Master at that point. And I'd like to reserve the remainder of my time if I could, Your Honors. Sure, Mr. O'Brien. Thank you. Mr. McKeon. Thank you. I'm John McKeon, and I represent the Paderak family. There is a lot of evidence in the medical records supporting the fact that this child who had a conceded adverse reaction to the vaccination on July 20, 1999, and a conceded static encephalopathy diagnosed for the first time in March. There were signs all along through the period between those two events indicating quite clearly that this child was not progressing normally. The initial problem of the Court of Federal Claims decision here seems to rest very heavily on interpretation of the testimony of Dr. Turow, which is difficult to follow. I mean, was the Court of Claims correct that Dr. Turow testified that he believed that the vaccine was the cause of the brain injury? That was a mistake. A clear mistake. Dr. Turow never said it that clearly. He did say that it was a likely cause, a possible cause, and he could find no other cause. Now, we have to realize that this child was looked at like everybody. There wasn't a doctor in the New York area that this child probably didn't see. Nobody could identify any other cause. So when you have a situation where a child has been thoroughly examined, we have one event. We have the July 20th vaccination with a documented adverse effect that the government has conceded, and we have a static encephalopathy, which is a brain injury, and it is a static encephalopathy. We're not talking about a child who's deteriorating here. We're talking about a child who has one injury, and it shows itself up in March, and if the child was only two months old when the injury happened, you're not going to see this stuff except when he fails to make his mildness. Now, we have, for instance, we have the September review where the child was found to be well-babied. Every expert, even the government's experts, said you couldn't credit that one because there's no way that a child that age could be sitting, and that says he was sitting. So that one is, Loving tells us we can't. That's the two-month review.  That's the two-month review. No, not two months. This is the September? Which month was this? September of 1999, okay, and it says the child was sitting, and everybody said you couldn't credit that report because no child that age could sit without being basically in something. They don't have the physical ability to do it, and even Dr. Witznesser, the government's expert, so stated. So we can't credit the statement in that one. Then we go into October, and we see this child is starting to be very close to being referred. Dr. Megson would have referred him right then and there. Now, Dr. Megson, by the way, was discredited on her... Could I just interrupt you for one second? I'm going to ask you to step back for one moment. Okay. Was there testimony as to the time period in which you would expect the developmental delay to be manifested if, in fact, it was caused by the vaccine? No, there's no testimony as to that, Your Honor. The testimony is that the incident, the injury occurred immediately. It occurred on July 20th. It would only be seen as the child progressed. Well, if there was no testimony as to the time period in which you would expect it to happen, why is everybody arguing about whether it manifested itself at three months or six months or nine months? Because the statute requires that where you have a conceded injury at a certain time, an adverse effect at a certain time, there must be... It must have sequela that shows up within six months. So that's where the argument is. The sequela have to show up in six months. The symptoms of the injury have to show up within six months. That's in the table. And, of course, the other thing that Judge Brayden depended upon here is a pertussis injury of this type is in the table. So the Secretary and the Congress have accepted the fact that pertussis can cause precisely this type of injury, but it must happen and show up within... Everybody agrees that there was some manifestation of the reaction to the vaccine immediately. So that's within six months. I don't think the statute means that every manifestation of injury has to occur within the first six months. Not everything, but in this particular case of pertussis, if it's a table injury, you have to have sequela within six months. We're not talking about a table injury. We're talking about an off-table injury and whether there was causation. And in considering that question, what's the relevance in the context of this case, whether the developmental delay was three months, six months, or nine months, if, in fact, there was no testimony about when you would expect it to be manifested if it was caused by the vaccine? The reason it's important in this case is because the government's position is there has to be a logical sequence of cause and effect. There has to be a connection between the incident in July and the diagnosis in March. And they're saying that there has to be some sign of it within a six-month period, and we're saying there was. So you didn't dispute that there has to be a sign. The question is whether or not it was significant enough. Certainly, there has to be some way to connect A to B. If it's far enough apart, you can't really say one is the other. But if, indeed, you can show a string of events that connect one to the other, then basically that's a logical cause and effect, and we agree with the government. It can't be. If there's a particular kind of injury that's normally manifested nine months after the injury is manifested, we're talking about an off-table case, I mean, you know, you can recover, right? It doesn't have to be something within six months. You have to be able to connect it somehow or other. Right. I mean, the six months isn't magic. There's no magic anywhere in vaccines. The six-month standard is for table injuries, right? The six-month standard is for table injuries. We're talking about off-table. Right. And so I come back to the question, why is everybody so concerned about the date in which the developmental delay was manifested if nobody testified one way or the other as to when you would normally expect this to be manifested? Yes. Well, I mean, the reason, essentially, is to show the connection between one event and the other. Now, the reason that Judge Brayden can go back and look at this is because there's been a major legal error. The special master did not look at what was finally diagnosed and then interpret what happened before with regard to that. And he's basically violating the rule in Markham. Do you want to tell me, get into a little more detail? I don't understand that point. Okay. The child was diagnosed with static encephalopathy in March, in late March of 2000 and several times after that. These events, which the special master says could be normal development, even though they were always very low normal, occurred before that and he deemed them to be normal development saying so the child is developing normally for seven months. J.P. was not developing normally for seven months. These medical reports that were interpreted not just by the medical experts, and let me as a pathologist with regard to the government's claim that this was a carrier 1 malformation that was withdrawn from the case at the beginning of that hearing. So he certainly could not testify as to child development. Dr. Megson could. We didn't bring Dr. Megson in as an expert on child development. We brought her in to testify as to causation with regard to pertussis. The special master made her an expert in child development, which she is, and asked her to analyze these things. She found J.P. to be far enough behind in October to have been referred for special services because he was failing to roll over and sit up. But the big issue is Dr. Toro, in January, determined by reviewing the report that was done in January by his office, that J.P. was at that time, he was a nine-month-old child and he was performing at between six and seven months. So he was already between 25% behind and 30% behind, and every analysis of J.P. after the diagnosis through the next year found him to be almost exactly that far behind. So the static encephalopathy was apparent, and the extent of it was apparent in January. Now the special master, and the government is trying to certify this, leads to the conclusion that the encephalopathy started between January and March. First of all, there was no event at all in the medical records or any testimony from parents or anybody of anything that happened between January and March. And the extent of his disability was the same in January as it was later in the year. So it was fully established that the encephalopathy was present in January, and the symptoms connecting it to the July event are seen in all of the medical reviews between. Now the other place where the special master just came to a conclusion that's not supported by the record is the child suffers from nystagmus, which is a neurological problem. It's a problem of the brain driving the eyes and the eyes jump all over the place. This was reported for the first time in October to Dr. Turow. He didn't see it. He thought it would be strabismus, which is lazy eye, which is a more normal and benign condition, and he referred him to an ophthalmologist who also didn't see it, but also concluded it must be the lazy eye, a benign condition. Nobody likes to see a fire when they think it could be something less. Nobody saw it until March, and when it was seen, it was diagnosed as nystagmus, a sign of his neurological problems. The special master left the conclusion it had to be lazy eye. There is no basis for that. Doctors hearing what a parent says and guessing what it was is far different than a doctor seeing it and diagnosing it, and under Markowitz, we have to go back and say it was more likely than not that this was nystagmus seen for the first time by a doctor, or should I say reported for the first time in the medical records in October. How can you do that when you have, during that period of time in the fall, doctors saying it's X, and you're saying they should have said it was Y? They didn't see it. It was misdiagnosed. They didn't see it, so they didn't know what it was. But how do you know it was misdiagnosed? It appeared in March, but does that mean it was present in the fall? Yes. It had to be present in the fall, because after it's diagnosed as nystagmus, after March, it is never diagnosed as lazy eye again. It is always a neurological problem after that, and it's still there. So as of the date of the hearing, the testimony of the father was it's the same thing he saw in September of 1999, and it's still there. So under Markowitz, a misdiagnosis is possible, but if it's doubtful, then it has to be interpreted as being consistent. Otherwise, I must say that the government's interpretation here that where something's a closed question, we can go back and define that as normal. Most members of the vaccine bar would love that, because many cases are dismissed for exactly this type of thing, where something is seen, not understood, later on as a diagnosis, and they understand that that was the first symptoms. Now, if it's good to dismiss a case, as Judge Brayden said, if it's good to dismiss a case, it's good to sustain one. And here we have a train of events between July and January that establishes that that static encephalopathy was there at all times. It started in July, and it was present in January, according to Dr. Turow, who's the treating physician. And so he basically said, and he also testified, that he could find absolutely nothing else. He couldn't say for sure that it was caused by a vaccine, but he could not find anything else. Are there any questions? I think we're finished. Thank you, Mr. McKeon. Thank you. Mr. Wallman. So, before you get into it, what is the significance of the developmental delay being three, six, or nine months, if there's no testimony by anyone that a particular period of time is significant in terms of causation? I think that there's very little significance to it in this case, and I was going to address that as my first point, which is, as the special master noted, it's the petitioner who has to show the time frame in which medical signs would expect the injury to be manifest. That's their burden. The special master found that the petitioner submitted no evidence and no testimony on this point, and my colleague just conceded that he introduced no evidence on this point. I think that makes their case fail on prong three, and that's sort of probably the easiest way for this case to be resolved. But putting it to one side for a moment, clause three, how does the timing of the developmental delay bear on causation if neither side put in any testimony suggesting, well, normally you'd see it in two months and you didn't see it, or normally you'd see it in six months and you didn't see it? It seems to me both sides just sort of ignored the significance, kept arguing about the developmental delay and when it was manifested without putting any testimony as to the relevance of the time period. Well, it's obviously, I think it's not our burden to establish that. That's the burden on the petitioner, as I think this Court has said. But I think our point was to show that the attack that was made by a petitioner, the claim that they were based on, was pointing at these well-baby visits and supposed missed milestones. We were responding to the argument that they were making it to try to establish their case. The problem is that the special master seemed to think it was highly significant that the developmental delay didn't occur until later, and yet the foundation for that, in other words, that it was significant that there was that much of a gap between the vaccine and the developmental delay, wasn't established. So, I mean, did the special master make an error in saying that the delay in the developmental effect showed that there was no causation when we don't know one way or the other whether that bears on causation? No, I don't think that's error, and here's why. I think that the normal operating presumptions when you're trying to figure out the cause and effect of anything, let alone of a vaccine injury, is that temporal proximity is something that you consider. Now, in the absence of saying, well, you wouldn't expect it to ensue immediately after, you'd expect a significant delay, I think normally people presume that you would see some close proximity, and the special master here was saying, you don't see any. Now, if the petitioner wants to say that's entirely what you would expect, they have the burden of showing that, which is why this court has established the time period requirement as part of prong three, but they haven't shown that. In the absence of showing that, you would just normally presume that when you had a vaccine at one point and an injury later on, absence of showing by the petitioner, you would think that the large separation of time tends to disprove causation. And just to get to a couple of other points, I think the special master here found Dr. Turow's testimony to be rather unpersuasive. The court of federal claims, I think, rather unreasonably found the opposite. I'd just like to quote a portion of his testimony. I think it's persuasive, and I think, as this court has said, it's important to look at the treating physician, which Dr. Turow was. And he said, and I'm quoting, Now, would I be able to get up here and say, oh, this is clearly a reaction to the vaccine? I'll be honest, no. I can't say that. I can't say that it is or it isn't. I just don't have any concrete evidence to connect the two. What he said was, at most, it's possible, and it's not impossible. But this court immorally said plausible or possible connections are not enough to meet the burden of proof. And here you have the treating physician saying, he's trying to be as generous as he can to help the physician, but he can't establish any connection. No concrete evidence to connect the two. I think that's almost dispositive to this case, and the special master's reliance on that, along with the other testimony saying no developmental delay, means the special master's decision was not arbitrary and should be upheld. If the court has any further questions, I'm at the end of my time, but I'd be happy to answer any questions. Thank you, Mr. Waldman. Thank you, Your Honor. Thank both counsel.